Milligan, J.,
delivered the opinion of the Court.
In this case, during the progress of the administration of the estate of Mrs. Rutledge, in 1865, a decree was pronounced in the Chancery Court at Nashville, in which it was declared, that Mrs. Rutledge, in her last Will and testament, directed all her real and personal estate to be sold, upon sucb terms as her executor might deem expedient; and after paying all her just debts, and also a legacy of $500, to Mary Nichol, the proceeds should be distributed /mong the complainants mentioned in the bill.
The property of the testatrix, seems to have consisted principally of real estate; and the Clerk & *556 Master, together with the executor, was appointed, under the decree, to conduct the sale. The Master is also directed to take an account of all the personal and real estate, and to ascertain and report the debts of every description, due and owing by the estate, or in any way constituting a lien on the lands.
Under this decree, the Master made his report; and, among other items, charged the estate with the sum of $3,658.08, due to the Corporation of the City of Nashville, for taxes assessed by the corporate authorities, on the real estate of the testatrix, within the city limits, for the years 1862-3-4-5.
To this item of the account, there were exceptions, which, upon argument, were overruled, and the report confirmed, and the Master directed to pay the city taxes, as charged in the account, out of the funds in his hands, for distribution. From this decree, the executor appealed, in error, to this Court.
The facts necessary to be noticed, show that the Mayor, and a majority of the City Council, resigned their offices, on the 5th of April, 1862; and five days thereafter, their places were filled by aldermen and councilmen appointed by order of Andrew Johnson, Military G-overnor of the State of Tennessee. The new Board organized under the authority of the Military Governor, and elected a Mayor and other officers, according to the provisions of the City charter. This organization assuméd control of the city government, on the 10th of April, 1862, and continued to exercise all its powers, until the 30 th of September, 1865, when it gave way to an election of *557 other officers by the people, under the resumed civil government of the State.
During the period, the city government was under the authority of the Mayor and Councilmen, elected under the orders of the Military G-overnor — the taxes, the payment whereof is now resisted — were all assessed. The property upon which they accrued, from April, 1862, to the close of the war, in 1865, was occupied and controlled, exclusively, by the military forces of the United States; and the actual damages, during this period, done to it by the troops, was estimated, by a Military Commission, organized in the city of Nashville, to be $3,790.
Two questions, under this state of facts, are presented in the record: 1st, Had the city authorities, elected under the order of the Military Governor of Tennessee, power to levy and collect taxes for corporation purposes, pending the military occupation of the city? 2nd, If such power existed, could the taxes thus assessed upon real property, within the city limits, exclusively occupied by the military forces of the United States, be collected after the war was over?
The answer to the first interrogatory, involves the consideration of the power of the parent Government, in a civil war, within a State, declared by the President of the United States to be in' rebellion against the Government of the United States, after it has, by military force, occupied, in whole' or in part, the territory of such revolted State.
*558 Admitting the two contending parties, in the late civil war, to have enjoyed certain belligerent rights, as against each other during the war, it is clear, upon the general principles of international law, there is a wide difference between military occupation and complete conquest. The former falls far short of the latter, and differs from it in many essential and important particulars. The latter, in its limited and technical sense, includes only real property, to which the conqueror has acquired a complete title. While the former is only held by the right of military occupation, until it is confirmed or made complete by treaty, or otherwise. Ordinarily, the right of one belligerent nation to occupy and govern the territory of the other, while in its military possession, is one of the incidents of war, and flows directly from the right to conquer. The Constitution, or political institutions of the conqueror, is not, therefore, looked to for authority to establish a government for the territory of the enemy in his possession during its military occupation, nor to the rules by which the framers of such government are regulated and limited. Such authority, and such rules are derived directly from the laws of war, as established by the usage of the world, and confirmed by the writings of publicists and the decisions of Courts. But, on the other hand, where the conquest is made complete — no matter how — the right to govern the acquired territory, follows as an inevitable consequence of the right of acquisition; and the character, form, and power of the ■ government established over such con *559 quered territory, are determined by the Constitution and laws of the State which acquires it, or with which it is incorporated: Halleck’s International Law, 775, sec. 1.
Another important distinction exists,'as to the rights which attach to a conquest, when it is made by the Government of Great Britain, and when made by the Government of the United States. English writers, say, that when a country has been conquered by British arms, it immediately becomes a dominion of the King, in right of his Crown, and that the inhabitants of such conquered territory, once received under the King’s protection, become his subjects, and are universally to be regarded in that light, and not as enemies or aliens. The conquest, ipso facto, completes the dominion over the territory, and' constitutes the inhabitants subjects of the Crown, without any act of the Legislature, or Parliament, whatever: Halleck’s International Law, 784, sec. 7.
Hot so, under the Constitution and laws of the United States. The military occupation by the United States, of a conquered territory, confers no such rights, either upon the Government, or the inhabitants of the occupied territory, as are claimed by English writers for a conquest by British arms. The territory passes under the control of the Government of the United States, as against all other nations, but it does not, ipso facto, become a part of it; and its inhabitants are subject to the government of occupation, under the direction of the President of the United States, as Commander-in-Chief of the army; or, in other *560 words, to government by martial law. Henee, the intercourse of foreign nations with such conquered territory, is subject to the will of the Commander-in-Chief; and he can, at his discretion, fix a scale of duties on goods imported into the conquered territory, and tonnage on vessels entering its ports, wholly different from those fixed by law, on vessels and goods brought into the United States: Halleck's International Law, 786, sec. 9; Thirty Hogsheads of Sugar vs. Boyle, 9 Cranch, 191; U. S. vs. Rice, 4 Wheaton, 246; 9 Howard, 603; 16 Howard, 164.
On principle, as well as authority, we apprehend, there is another just distinction between a conquest made in the course of a foreign war, and a military occupation by a belligerent in a territorial war. It cannot, in any just sense, be said, that the metropolitan government, in a territorial war — such as our late war was — can make a conquest of its own territory, or, by the triumphs of its arms, gain any higher rights over the soil and the inhabitants of the revolted district, than it enjoyed before such war. Ordinarily, the object of a State, in a civil war, is, to suppress rebellion, and to coerce the revolted inhabitants, by the sword, into obedience to the Government and laws of the parent State. This end accomplished, we apprehend, if the revolted district was an integral part of the territory of the metropolitan government prior to such war, the general laws, proprio vigore, would extend over it: Halleck’s International Law, 784, sec. 8.
But, pending the war, the revolted territory actually occupied by the military power of the United *561 States, is subject to the laws of the belligerent occupation. The authority of the conqueror in such a case, is, ex necessitate, paramount. His title rests on force, and is measured by it. He may suspend the municipal laws of the State, or district, thus occupied, if the safety or interest of the parent Grovernment demands it; or otherwise, by permission, the private and municipal laws of such conquered territory remain in force: Dana’s Wheaton, 436-437, bottom, and note 1.
Under this doctrine, which seems to be recognized by the laws of war, the President, in the exercise of his constitutional power as Commander-in-Chief of the Army and Navy, and the military officers under his authority, may, when war actually exists, whether it be territorial or foreign, seize the enemy’s possession, and establish a temporary government and laws for the territory so seized and occupied: Halleck’s International Law, 784, sec. 8; Dana’s Wheaton, 436, bottom, note 1; Flemming vs. Page, 9 Howard, 615; Cross vs. Harrison, 16 Howard, 164.
In strict accordance to the laws of war, as recognized by the highest judicial authority of the United States, on the 3rd of March, 1862, the Secretary of War, issued to Andrew Johnson, the following Commission, or letter of appointment:
“Wab Depaetment, March 3, 1862.

“To the Hon. Andrew Johnson:

“Sib: — -You are hereby appointed Military Grovernor of the State of Tennessee, with authority to exercise and perform, within the limits of that State, all and *562 singular, the powers, duties and functions, pertaining to the office of Military Governor, including the power to establish all necessary offices, tribunals, etc.
“Edwin M. Stanton,

“Secretary of War.”

And, therefore, on the 19th of September, 1863, the President of the United States, by open letter or Commission, clothed him with the following power:
“Executive Mansion, Washington, D. C., ) “September 19, 1863. j

“Hon. Andrew Johnson, Military Governor of Tennessee:

“You are hereby authorized to exercise such powers as may be necessary and proper, to enable the loyal people of Tennessee to present such a republican form of State Government, as will entitle the State to the guarantee of the United States therefor; and to be protected, under such State Government, by the United States, against invasion and domestic violence. All according to the 4th section of the 4th article of the Constitution of the United States.
“Abbaham Lincoln.”
A careful inspection of the authority under which the Military Governor acted, demonstrates the fact, that the leading object of his appointment, was, to sustain the military occupation of the State, and to inaugurate a temporary government, for the protection of the inhabitants of the district occupied, deriving all its powers from the President, as Commander-in-Chief of the Army of the United States, and based, as far as practicable, upon the private and municipal laws of *563 the State. To that end, by the terms of his appointment, under the order df the Secretary of War, he was clothed with authority to exercise “all the powers, duties, and functions, pertaining to the office of Military Governor, including the power to establish all necessary offices, tribunals, etc.”
It is equally clear, from the order of the President, issued more than a year after the date of the Military Governor’s appointment, that the President sought, as Commander-in-Chief of the Army and Navy, to avail himself of the temporary government arranged in Tennessee, under the military power of the nation, as a means of re-establishing in the State, such a republican form of State Government, as would entitle the State to the constitutional guarantee of the United States, and to such protection, as a State Government, from the United States, as would he necessary to shield it, and the inhabitants yielding their assent thereto, from invasion and domestic violence.
This organization, the end and aim of which, was to suppress the rebellion, and to restore the State to its former relations to the National Government, as an arm of the conquering military power of the Government, had not only the right, under the laws- of war, to demand and receive the taxes, rents, etc;, paid to the State, (Halleck’s Intern’l Law, 780, sec. 4; Dana’s Wheaton, sec. 346, and notes,) but to levy contributions, or impose forced loans, and to levy and collect taxes, under the municipal laws of the State, which had been previously enacted, and which had not been superseded by the will of the conqueror; *564 for otherwise, the private and municipal laws remain in force: Dana’s Wheaton, 435, note 4.
Under this authority, the taxes, the payment whereof is contested in this case, were assessed. The power of the corporate authorities to make the assessment, was derived directly through the military power of the United States, holding, at the time, a belligerent occupation of the city of Nashville, which was the enemy’s territory, and subject to the will of the conqueror. The taxes, thereupon, were lawfully assessed, under the recognized laws of war, and could have been collected and appropriated by the city authorities then in power, to any corporation purposes, during the existence of the war, and pending the belligerent occupation of the city.
This brings us to the consideration of the second question arising on this record. Could the taxes so assessed by the Municipal authorities, upon property within the city limits, and exclusively occupied by the military forces of the United States, be collected after the belligerent occupation has ceased?
The Mayor and Councilmen of the Corporation of the City of Nashville, it is insisted, having been appointed by the authority of the Military Governor of the State, held their offices de jwre, belli, and, as a consequence, their power would, cease with the termination of the belligerent occupation of the city. Pending the war, and during the military occupation of the revolted district, it is admitted the city authorities could lay and collect taxes, as an arm of the military power, and in furtherance of its purposes; but, after peace, the *565 arrearages of such taxes did not remain as a debt, or charge upon the property upon which they were assessed. How this might be, in case of a foreign war, and a belligerent occupation, or even a conquest of enemy’s territory, is not necessary to be determined. But, in this case, the objects of the war were accomplished by a complete suppression of the rebellion; and the military steps to restore the civil administration in the State, begun under military authority, have since ripened into a reorganization of all the departments of a State Government, which have been recognized by the political power of the nation, as a regular and subsisting State Government, and, as such, entitled to all the guarantees secured to the several States in the Union, by the Constitution of the United States. The accomplishment of this object, was, as we have seen, one of the leading purposes of the appointment of a Military Governor in Tennessee, and his acts, in this respect, have been recognized by the National Government, and ratified and confirmed by the loyal people of the State.
The seventh section of the Schedule to the amended Constitution of the State, declares: “All civil and military officers, who have been, or may hereafter be, appointed by the acting Governor of the State, are hereby ratified and affirmed, and they shall continue to hold and exercise the functions of their respective offices, until their successors shall be elected or appointed, and qualified, as prescribed by the laws and Constitution of the State and United States.”
The obvious intention of this provision of the Schedule, which, with great uninimity, was ratified by *566 tbe loyal people of the State, was, to approve and affirm the acts of the Military Governor, to restore the displaced civil organization of the State Government ; and, at the same time, to prevent a hiatus, or interregnum, between the military and civil administration of the State Government. How, then, can it be said, that the taxes assessed by the Municipal authorities of the City of Nashville, flagrante hello, cannot now be collected ? True, the Mayor and Councilmen held their offices by virtue of the military power of the United States, but they assessed the taxes under the laws and Constitution of the city corporation. They were not levied as arbitrary assessments, or imposed as forced loans, and applied to military purposes, but assessed by the municipal authorities, for the ordinary corporation purposes.
These taxes seem to have been imposed according to the charter and laws of the Municipal Corporation, by a competent board of officers; and the fact that the property was seized and occupied by the military forces of the United States, can certainly furnish no legal ground for resisting their payment.
The right claimed and exercised, by the United States, in the late civil war, to seize and occupy private property, is distincely declared and limited in an order issued from the War Department, on the 24th of April, 1863, and known as “ Military Order No. 100.” In sec. 2 of this Order, par. 27, it is declared: That “ the United States acknowledge and protect, in hostile countries occupied by them, religion and morality; strictly private property; the persons *567 of the inhabitants, especially those of women; and the sacredness of the domestic relations. Offenses to the contrary shall be rigorously punished.”
“ This rule does not interfere with the right of the victorious invader to tax the people or their property, to levy forced loans, to billet soldiers, or to appropriate property, especially houses, lands, boats or ships, and churches, for temporary and military uses.”
By par. 38, it is further declared: “ Private property, unless forfeited by crimes, or by offenses of the owner, can be seized . only by way of military necessity, for the support or other benefit of the army, or of the United States.”
“If the owner has not fled, the commanding officer will cause receipts to be given, which may serve the spoilated owner to obtain indemnity.”
By the terms of this Military Order, which is but a condensed declaration of the laws of war, as universally recognized by all civilized nations, the right to seize private property rests upon the military necessity that exists at the time, and its use and occupation, if not perishable in the using, are temporary. The title is not divested, and if the owner has not fled, or forfeited his property by crimes or offenses, the commanding officer is bound to give him a receipt, which will enable him to obtain indemnity for his spoilations.
Now, under this state of the law, how could the temporary occupation of the property, by the military forces of the United States, defeat the right of the *568 Municipal Corporation to collect tlie arrearages of taxes assessed upon it ? We have shown the taxes imposed were not for military purposes, but for the use and benefit of the Corporation; and, by the express provisions of an Act .of the Corporation, passed on the 9 th of January, 1857, sec. 3, the taxes on real and personal property, as well as that set aside for school purposes, levied in the city of Nashville, are declared to be due and payable, at the office of the Revenue Collector, on the first day of July, in each year; and all persons who fail to pay said taxes by that time, as declared by this Act of the Corporation, are chargeable with interest thereon.
By this Ordinance, the taxes of the corporation constitute a debt, due from the owner of the property upon which they are assessed, to the Corporation. See, also, The Mayor and Aldermen of the Town of Jonesboro' vs. N. McKee, 2 Yer., 167-170. The amount of the taxes depends upon the value of the property at the time of the assessment; and the legal owner’s liability to pay them certainly does not depend upon the rents or income derived from the •property taxed.
The Corporation has nothing to do with the management of the taxable property within the city limits. It is in no sense, responsible for any of the casualties to which it is exposed, and if it be swept away by a tornado, consumed by fire, or seized by the military forces of the United States, in a war waged for the suppression of a rebellion against its lawful authority, the debt remains, and all such cas *569 ualties, however severe they may be, cannot be set up to defeat its collection.
The decree of the Chancellor, disallowing the exceptions to the Master’s report, must be confirmed; and the costs paid out of the funds of the estate.